**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL MILLER, | : | Case No. ____________________ |
| ARGO PRIVATE CLIENT GROUP, INC., | : | JUDGE |
| ALLISON CROSS | : | |
| Plaintiffs, | : | COMPLAINT FOR DAMAGES IN |
| v. | : | EXCESS OF $75,000.00 AND |
| KEVIN P. KRUPNICK | : | PUNITIVE DAMAGES IN EXCESS OF |
| and DAVID BURLINGAME, | : | $225,000.00 |
| THE KRUPNICK FIRM LLC | : | |
| Defendants. | : | |
| | : | JURY DEMAND ENDORSED HEREON |

Now come Plaintiffs, Dan Miller, Argo Private Client Group and Allison Cross and do submit the following as their causes of action in the above captioned matter:

**PARTIES**

1. Plaintiff Daniel Miller (hereafter referred to as "Mr. Miller") is an individual domiciled in the City of Aurora, Portage County, Ohio, and is a citizen of Ohio. At all relevant times, he acted as Pcitizen of Argo Private Client Group, Inc..

2. Plaintiff Argo Private Client Group, Inc (hereafter referred to as "Argo"). is an Ohio corporation, duly registered with the Ohio secretary of State, with its principal place of business in Aurora, Ohio. Argo is a citizen of Ohio and is the general partner of Aurora Hill Limited, an Ohio limited partnership.

3. Plaintiff Allison Cross (hereafter referred to as "Ms. Cross) is an individual domiciled in the City of Pompano Beach and is a citizen of the State of Florida and at all times relevant had no legal connection with Dan Miller

4. Defendant Kevin P. Krupnick (Krupnick) is an attorney admitted in New York and, on information and belief, is domiciled in the City of Glen Cove, County of Nassau and is a citizen of New York. He practices through The Krupnick Firm and represented David Burlingame in the dispute described below.

5. Defendant The Krupnick Firm, LLC (Hereafter "Krupnick Firm") is a single member professional limited liability company , solely owned and operated by Krupnick, duly registered with the New York Secretary of State having an address of 56 HAMMOND RD., GLEN COVE, NY, UNITED STATES, 11542

6. Defendant David Burlingame (hereafter referred to as "Burlingame") is an individual who, on information and belief, is domiciled in and a citizen of Alaska.

**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiffs are citizens of Ohio and Florida, Defendants are citizens of New York and Alaska, and the amount in controversy exceeds $75,000 for each claim by Mr. Miller, $75,000.00 for each claim by Argo Private Client Group, LLC and $75,000.00 per claim for Ms. Cross, exclusive of interest and costs.

8. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District.

9. Personal Jurisdiction is proper under the Ohio long arm statute, O.R.C. 2307.382, including, but not limited to, Causing tortious injury by an act or omission in this state, Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state and or (7) Causing tortious injury to any

person by a criminal act, any element of which takes place in this state, which the person commits or in the commission of which the person is guilty of complicity.

**FACTS COMMON TO ALL COUNTS**

10. At all times pertinent, Argo was located and conducted all operations from its' Aurora, Ohio location. Miller acted for Argo in the dealings relevant to this Complaint and did not hold a separate personal office with Aurora Hill.

11. Argo is the general partner of Aurora Hill Limited (hereafter "Aurora Hill").

12. Aurora Hill operates as a limited partnership for the purpose of allowing limited partners to pool their resources as part of a private investment plan.

13. Aurora Hill is open only to qualified and accredited investors.

14. An individual or entity seeking to become a limited partner is provided, upon request, with the Aurora Hill subscription documents and agreement (Subscription Agreement) and private placement memorandum (PPM). Burlingame executed a Subscription Agreement and completed the investor-qualification process, including independent third-party verification of his accredited-investor status.

15. The Subscription Agreement informs applicants that the terms of the partnership are defined in the PPM.

16. The offering documents disclosed that an investment involved significant risk, including the possibility of total loss. Plaintiffs do not allege that Burlingame was guaranteed a return or protection against market loss.

17. On May 13, 2021, Burlingame executed a Subscription Agreement to become a limited partner of Aurora Hill.

18. Burlingame's initial investment was One Hundred Thousand Dollars ($100,000.00).

19. After certification as a qualified and accredited investor, Burlingame became a limited partner in Aurora Hill, and his funds were used for investment under the PPM.

20. After his initial investment had been traded, Burlingame decided to invest an additional One Million Five Hundred Thousand Dollars ($1,500,000.00), bringing his total investment to $1.6 million. Argo had asked him to increase his allocation; Burlingame selected the additional amount himself.

21. Burlingame's investment sustained trading losses in the program managed by Ryan R. Nelson. Miller, Argo and Nelson did not misappropriate his investment funds or receive compensation from him in connection with those losses.

22. Burlingame initially accepted that the losses were part of the investment risk and resulted from market fluctuations. At one point, he commented that his investment in Aurora Hill was doing better than his other investments.

23. That Miller had no part in the day to day trading of funds placed with Aurora Hill.

24. That all trading was conducted by Ryan Nelson, as identified in the Aurora Hill PPM.

25. That Burlingame had multiple conversations with Nelson regarding the trading platform and the results.

26. That subsequent to the close of trading for Aurora Hill, Burlingame engaged Nelson to hedge positions on his other investments.

27. That Burlingame was aware that Miller was not involved in the day to day trading.

28. That Burlingame was aware that all trades were cleared through Smith Barney.

29. That Burlingame was aware that a computer trading program that was well established in the industry was utilized by Aurora Hill as part of their trading strategy.

30. That the same system used by Aurora Hill was used by Nelson in his hedging of Burlingame's other positions.

31. That all of this information was in the possession of Burlingame in during the course of his investment with Aurora Hill and no later than September of 2022.

32. That near the end of his investment in Aurora Hill, Burlingame approached Miller regarding investing in a marketing program.

33. After trading in Aurora Hill had stopped for several months, Miller and Burlingame agreed to a separate written $150,000 investment in Argo Marketing Group. Approximately $100,000 remained in Burlingame's Aurora Hill account, with the balance of the agreed amount to be contributed separately. Burlingame authorized the withdrawal in writing under that separate agreement.

34. Burlingame executed a separate written agreement for a $150,000.00 investment in Argo Marketing Group.

35. The separate agreement was executed on or about September 7, 2022.

36. On information and belief, at some point between September 7, 2022 and December 2023, Burlingame came into contact with Krupnick and the Krupnick Firm.

37. After that contact, Krupnick contacted Miller and demanded repayment of Burlingame's entire investment.

38. That as part of this contact, Krupnick made several threats.

39. Krupnick threatened Miller with negative publicity for him and his businesses.

40. Krupnick threatened regulatory or criminal escalation, including possible referral to the SEC or FINRA.

41. That in response to the claims made by Krupnick on behalf of Burlingame,

Miller and his counsel sent the Schedule K-1 and supporting accounting response reflecting trading losses. On December 20, 2023, Miller sent Burlingame the completed accounting package, and attorney Joseph P. Szeman wrote to Krupnick that the K-1 was complete and being forwarded to his client.

42. The 2022 Aurora Hill partnership return and Burlingame's Schedule K-1 was prepared by NMS Accounting, a certified public accounting firm

43. In a December 19, 2023 letter, John W. Lynagh, CPA, described reconciling TD Ameritrade monthly broker statements with consolidated tax information, considering company checking-account information and other documentation, and carrying the resulting realized gains and losses through the partnership return to the K-1.

44. Szeman's December 20 letter identified NMS, explained that the records supported market-driven losses and that no fees had been allocated to the general partner, and requested that Krupnick identify his proposed claims and their supporting facts with particularity. Miller and Argo maintained that the records accounted for Burlingame's investment and did not support diversion or misappropriation.

45. Even after those materials were provided, Krupnick continued to demand repayment of Burlingame's investment.

46. The initial demand preceded Miller's retention of counsel and was sent by facsimile to his eFax account. Miller received and read it in Aurora, Ohio. Krupnick demanded return of Burlingame's $1.6 million investment and coupled that demand with statements about his regulatory contacts and possible escalation to the SEC, FINRA or criminal authorities if the demand was not addressed.

47. Miller referred the demand to counsel. Subsequent communications from Krupnick were handled through attorneys. Plaintiffs provided the financial and accounting response described above, but the restitution demands and alleged threats continued.

48. Argo filed an earlier action against Burlingame in the Northern District of Ohio, No. 5:24-cv-00436, on March 6, 2024.

49. The earlier action was dismissed on June 21, 2024.

50. On February 27, 2025, Burlingame, by and through Krupnick, brought suit in the Southern District of New York, No. 1:25-cv-01704-JMF, naming Miller, Argo, Aurora Hill and others, including Allison Miller, Ryan Nelson, the Beechwood and Suede Nights entities, Leading Response/RME and Derek Scarborough.

51. That none of the parties to the litigation were citizens of New York.

52. That none of the events in question took place in New York.

53. That even assuming probable cause for filing the litigation in general, no grounds existed for filing in the Southern District of new York.

54. That the purpose of filing in New York was the first step in a larger scheme to damage Mr. Miller and his businesses while simultaneously promoting Krupnick and the Krupnick firm based on the visibility the filing of such a suit in the Southern District of New York would create.

55. Plaintiffs challenged New York venue and the asserted connection between that forum and Burlingame's investment.

56. The original complaint accused Miller and the associated businesses of diverting or misappropriating investment funds and included a separately titled "Ponzi Scheme" count.

57. That the allegations of misappropriation are directly contradicted by the K-1 and associated documents provided to Burlingame and Krupnick.

58. Krupnick claims to have done a thorough pre-litigation investigation of all parties named in the lawsuit.

59. The paragraph 4 of the Amended complaint claimed that Daniel Miller, personally, had been permanently barred by the National Futures Association (NFA) on March 18, 2021.

60. That a review of the NFA's "BASIC" search engine shows that Daniel Miller has never personally been the subject of NFA action and is not subject to a bar, permanent or otherwise, from the NFA.

61. That this statement was false.

62. That the decision referred to contained no findings of wrongdoing by Miller.

63. That the decision referred to resulted in the surrender of membership and agreement not to reapply for Argo Wealth Management.

64. That Miller was never a named party in the NFA decision.

65. That Argo Wealth Management and Argo Private Client Group have separate registrations with the Ohio Secretary of State and are legally separate entities.

66. That a review of the NFA's BASIC website shows no registration for Argo Private Client Group.

67. That Ms. Cross was identified as a defendant in both the original and Amended Complaint under her former name, Alison Miller.

68. Ms. Cross is Dan Miller's former wife.

69. That Mr. Miller and Ms. Cross were divorced in Geauga County on or about August 8, 2011.

70. That the case is titled Daniel M. Miller v. Allison R. Miller and is assigned Geauga County Court of Common Pleas case No. 11DK534.

71. That the original complaint claimed that Mr. Miller transferred real estate to Ms. Cross without adequate compensation.

72. That all assets and interests in assets once held by Mr. Miller and Ms. Cross were legally separated and severed as a function of the Geauga County Court of Common Pleas divorce case, 11 DK534.

73. That at the time Mr. Burlingame executed the subscription agreement, Mr. Miller and Ms. Cross had been divorced for over a decade.

74. That the complaint asserted that Ms. Cross received the real estate as part of a broader scheme to defraud Mr. Burlingame.

75. That Mr. Miller did not make any real estate transfers to Ms. Cross after the Geauga County divorce action was concluded.

76. That Mr. Miller' last real estate transfer was on June 19, 2020.

77. That the recipient of the transfer was not Ms. Cross.

78. That Mr. Burlingame did not execute the subscription agreement until after Mr. Miller effected the last real estate transfer to a third party.

79. That no records of any real estate transfer from Mr. Miller to Ms. Cross exist for any time period between 2020 and the filing of the complaint by Defendants.

80. At the time of the New York lawsuit, both Miller and Allison Miller had married other people.

81. That Mr. Miller remarried in 2017.

82. That Ms. Cross remarried in 2025.

83. That Ms. Cross was never listed on the title for Mr. Miller's residence in Aurora Ohio.

84. That Ms. Cross sold a separate residence in Aurora Ohio in 2024.

85. That Ms. Cross relocated to Florida in 2024.

86. That all of the events identified in paragraphs 81-85 occurred at least six months prior to the filing of the lawsuit in the Southern District of New York.

87. That the real estate transfer, address, divorce and wedding license information for Mr. Miller is all available through free public record websites.

88. Mr. Miller remarried in Their divorce was finalized by the Geauga County Court of Common Pleas in Case No. 11 DK 534 on August 8, 2011, nearly fourteen years before the New York lawsuit.

89. The divorce information was publicly available, and Plaintiffs gave Defendants the court and case information during the litigation.

90. That a simple background check using Intelius or any similar background check website would have confirmed that Ms. Cross and Mr. Miller were not married.

91. That Burlingame had not contact with Ms. Cross and has never met Ms. Cross.

92. That at all times relevant to the complaint, including but not limited to the duration of the business relationship between Burlingame and Aurora Hill and/or Burlingame and Mr. Miller, Ms. Cross lived separate and apart from Mr. Miller.

93. That without any additional information other than the incorrect assumption that Ms. Cross was married to Mr. Miller, the complaint accused Ms. Cross of being a party to the fraudulent transfer of assets valued up to 1.6 million dollars and assisting Mr. Miller in hiding "misappropriated funds."

94. That Krupnick and Burlingame were put on constructive notice of the lack of legal relationship between Mr. Miller and Ms. Cross by reference to the Court, case number and date of divorce no later than May 28, 2025 by means of the Brief in Opposition to Motion for Default Judgment filed by Mr. Miller, Ms. Cross and Argo Private Client Group.

95. That the Motion for Default relied on sworn statements by Krupnick claiming service on Mr. Miller, Ms. Cross and Argo Private Client despite the fact that summons had not been issued by the Southern District of New York, that the summons attached to the pleading delivered to Mr. Miller at his home residence referenced an Alabama case and neither Ms. Cross nr Argo Private Client Group were legally addressed at Mr. Miller's residence.

96. Despite the divorce and the information supplied, Defendants continued to name Allison Miller and accuse her of assisting a fraudulent conveyance exceeding $1 million.

97. Allison Miller had no role in Burlingame's investment or the handling of his investment funds. Miller and Allison lived separate lives following the divorce, apart from raising their child.

98. Suede Nights was a nightclub Miller owned from approximately 2006 through 2008 and had no role in Burlingame's later investment.

99. Defendants did not obtain signed and sealed summonses in the New York action within the time prescribed by Rule 4(m). Corrective summonses were requested on April 10, 2026 and issued on April 13, 2026 after transfer to Ohio.

100. After the default proceedings were challenged, Burlingame withdrew the default request and obtained leave to amend. The amended complaint removed the separately titled Ponzi-scheme count but continued allegations of fraud and diversion of funds.

101. Krupnick and/or the The Krupnick Firm maintain and operate the website https//thekrupnickfirm.com.

102. That at some point after filing the litigation, Defendants Krupnick and The Krupnick Firm published a page update to the "Firm Investigations" page of their website..

103. When this Investment Partnership link is selected, the website redirects to a new page whose URL is https://krupnickfirm.com/aurora-hill.

104. The following statements are made on Investment Partnerships page:

   a. Krupnick Firm has filed a securities complaint involving the conduct of Daniel Miller, Argo Private Client Group, Ltd., and other associated parties arising from the alleged use of materially false and misleading statements, undisclosed regulatory events, and the misuse of investor funds in connection with the solicitation and sale of interests in the Aurora Hill investment fund to one of the firm's clients. The matter remains unresolved.

   b. The complaint alleges that investors were told that Aurora Hill was operated by experienced investment professionals and that the fund would be managed through a structured investment program designed to generate returns for investors. The claim further alleges that investors were not informed of significant regulatory events involving the fund's principal, including an industry bar issued by the National Futures Association in March 2021, which allegedly rendered the offering ineligible for reliance on certain federal securities exemptions.

   c. The complaint also alleges that investor funds were diverted from their stated investment purpose and used for undisclosed activities, including promotional investor seminars and transfers to affiliated individuals and entities that did not provide investment services in connection with the fund.

105. The claim of a securities complaint is false as no complaint was ever filed with the SEC or FINRA.

106. The claim of a regulatory event and an industry bar involving a principal of Aurora Hill is false as Miller was never barred by the NFA and Aurora Private Client Group was not the whose membership was surrendered in the March 2021 NFA action.

107. That the March 17, 2021 decision makes no findings of wrongoing and makes no reference to either Miller or Argo Private Client Group.

108. That the claim that investor funds were diverted was false and/or made with reckless disregard for the facts.

109. That the accusation of diversion of funds is an allegation of criminal counduct.

110. That Burlingame and Krupnick were aware that Burlingame had authorized the remaining funds withdrawn from Aurora Hill to be used as his investment in Argo Marketing.

111. That Burlingame executed a contract making him a member of Argo Marketing in September of 2022.

112. That the Argo Marketing contract was part of the Motion to Dismiss filed by Mr. Miller, Ms. Cross and Argo PCG in the Southern Distrct of New York on May 28, 2025.

113. That the filing of the contract put Krupnick on constructive notice that Burlingame had authorized his funds to be used for marketing purposes.

114. That Burlingame as a signatory to the contract, was aware that the allegations in the original complaint regarding unauthorized use of funds for marketing was false.

115. That Burlingame and Krupnick filed the Amended Complaint on June 23, 2025.

116. That the Amended Complaint continued to allege that Mr. Miller and /or Argo PCG misappropriated funds for use in a marketing program.

117. That the Amended Complaint continued to claim that Ms. Cross was part of a fraudulent conveyance scheme to divert funds misappropriated from Mr. Burlngame.

118. When the divorce was again raised, and part of the Motion to Dismiss the Amended Complaint, Defendants asserted that it was a sham and evidence of efforts to conceal funds for Miller.

119.

120. On December 17, 2025, the Southern District granted Leading Response's motion to dismiss under Rule 12(b)(6), denied leave to amend the claims against it, and transferred the remaining action to the Northern District of Ohio under 28 U.S.C. § 1406(a) for improper venue. The transferred case was assigned No. 5:25-cv-02800-JRA.

121. Upon transfer, Plaintiffs renewed their motion to dismiss on January 29, 2026, at ECF 64.

122. Burlingame's response continued to defend the allegations against Allison Miller despite the prior divorce and the information Plaintiffs supplied.

123. The original complaint asserted that Burlingame had not been provided a K-1 for his investment, although the December 2023 communications and Szeman's later affidavit documented the accounting response.

124. In the original and amended complaints, Defendants claimed that Burlingame's funds had been misappropriated by Miller rather than lost in trading.

125. In the original and amended complaints, Defendants accused Allison Miller of assisting Miller in the misappropriation of Burlingame's funds.

126. Those accusations conflicted with the brokerage records and CPA-prepared K-1 materials, which showed that Burlingame's investment sustained trading losses and was not diverted by Miller or Argo.

127. Defendants continued pursuing the challenged accusations after the accounting materials and the requests for particularized supporting facts had been supplied.

128. Miller also sent his attorneys' substantive responses directly to Burlingame from his Argo email account, copied other recipients, and retained those messages. Burlingame did not disavow the challenged demands or direct that they stop, and the conduct continued and escalated in litigation brought in his name.

129. After the renewed dismissal briefing, Plaintiffs' counsel sent Krupnick a March 20, 2026 letter identifying asserted factual and legal deficiencies and demanding withdrawal of the challenged claims.

130. Krupnick responded in writing to Attorney Jay F. Crook with further demands for payment and threats concerning Miller's exposure to criminal prosecution and damage to his business and reputation.

131. The response invoked a claimed relationship with the owner of a private club in Florida and suggested that influence could be used to bring Miller to the attention of federal prosecuting authorities unless Burlingame's investment was repaid.

132. The response referred to Miller going to "Club Fed" and urged payment arrangements. Miller understood the communication, in context, as conditioning avoidance of threatened prosecution and professional harm on repayment of Burlingame's investment.

133. Krupnick also threatened to destroy Miller's business and reputation. In written communications to Crook, he stated that future clients would find the accusations online and explained that repeated filings would increase their visibility. Plaintiffs allege that the intended effect was to make continued business untenable unless repayment was made.

134. Plaintiffs refused the demand for restitution of market losses. Miller and Argo incurred expense in obtaining advice and responding to the alleged threats and undertook the reputation and business-repair efforts described below.

135. The Krupnick Firm website was publicly accessible and was preserved on September 3, 2026 at https://krupnickfirm.com/aurora-hill. Miller first learned of the page on September 4, 2026. The repository contains the contemporaneous capture and record of discovery.

136. The page is headed “Aurora Hill Fund Investor Investigation” and identifies Daniel Miller and Argo in that heading. It characterizes the securities complaint as alleging misleading investment statements, undisclosed regulatory matters and misuse of investor funds. It states: “The matter remains unresolved.”

137. The page expressly attributes to the complaint an allegation that “investor funds were diverted from their stated investment purpose.” It describes alleged undisclosed uses involving promotional investor seminars and transfers to affiliated persons or entities that supplied no investment service for the fund.

138. The investment of $150,000.00 in Argo Marketing Group was not only disclosed, but Burlingame executed a contract authorizing the investment of said funds.

139. The written agreement was provided to Krupnick in the Southern District of New York litigation.

140. Burlingame had firsthand knowledge that he authorized the separate use of the funds remaining in his Aurora Hill account.

141. Burlingame had firsthand knowledge of the authorization, and Krupnick and the Krupnick Firm received the written agreement and supporting records in the litigation no later than May 23, 2025.

142. The page promotes Krupnick's legal services and invites persons who invested in Aurora Hill or other programs associated with Miller or Argo, and experienced losses they believe may relate to wrongdoing, to contact the firm for a free case consultation. Plaintiffs allege on information and belief that Krupnick caused or approved that commercial solicitation to associate their names with misuse of investor funds and attract prospective clients to his firm.

143. Miller and Argo did not divert Burlingame's investment capital to undisclosed promotional seminars or to affiliated persons who supplied no investment service. The December 2023 accounting response was provided to Burlingame and Krupnick through counsel before the lawsuit and publication. Krupnick used the accusations despite that response.

144. The preserved September 2026 page did not state that the transferred action had been dismissed without prejudice on July 29, 2026.

145. On July 8, 2026, Magistrate Judge Amanda M. Knapp recommended dismissal of the amended complaint without prejudice as to the Aurora Hill defendants for insufficient service. The report expressly did not reach the Rule 12(b)(6) merits. N.D. Ohio ECF 88 at 6 n.1 and 20–25.

146. On July 22, 2026, the Aurora Hill defendants objected to dismissal without prejudice and requested dismissal with prejudice, citing the history of defective service, repeated notice, challenged filings, threats and resulting harm.

147. On July 23, 2026, Burlingame filed a notice of voluntary dismissal under Rule 41(a), attempting to seek removal of the case before District Judge John R. Adams had a chance to rule on the Aurora Hill parties request to have the matter dismissed with prejudice.

148. On July 29, 2026, District Judge John R. Adams dismissed the transferred matter without prejudice. The Court also denied the sanctions motion for failure to comply with Rule 11's safe-harbor requirements. N.D. Ohio ECF 91 at 1–2.

149. Krupnick's separately published solicitation remained available with the language described above after that dismissal. Plaintiffs learned of the separate page in September 2026 and had not previously requested its correction or removal.

**COUNT ONE**

**DEFAMATION PER SE**

150. Plaintiffs hereby incorporate the allegations in paragraphs 1-149 as fully rewritten herein.

151. The Krupnick Firm's public website published the identified statements about Miller and Argo to persons outside the litigation.

152. That the purpose of this publication was to promote the legal practice of Krupnick and solicit business for the Krupnick firm.

153. Plaintiffs allege on information and belief that Krupnick caused or approved that publication. The page identified both Plaintiffs by name and associated them with misuse and diversion of investment funds.

154. That Krupnick knew or should have known, as an attorney, that the accusation of diversion and misuse of investor funds is an allegation of a criminal act.

155. That Krupnick had no factual information to support this claim.

156. That this claim was made with knowledge of its' falsity and / or with reckless disregard for the truth.

157. That the same webpage made claims that Miller and/or Argo PCG, identified as the "fund's [Aurora Hill] principal" had received an "industry bar" from the National Futures Association in March 2021.

158. That there is a decision of March 17, 2021issued by the National Futures Association but that decision makes no mention of or reference to Mr. Miller or Argo PCG.

159. That the decision is only in reference to Argo Wealth Management.

160. That the decision makes clear that there was no finding of wrongdoing.

161. That Argo Wealth Management is a separate and distinct entity from Argo PCG.

162. That as an attorney, Krupnick knew or should have known that the decision of March 17, 2021 did not affect any principal of Aurora Hill.

163. That a review of the National Futures Association's Basic system would have shown that Mr. Miller received no personal discipline from the NFA.

164. That the Basic System would also show that Argo Private Client Group has never been sanctioned by the NFA.

165. That the Basic System also shows that Argo PCG was never registered with the National Futures Association.

166. That the false claim was made with knowledge of its falsity and/or with reckless disregard for the truth.

167. Plaintiffs allege that the public solicitation, read as a whole and in its commercial context, conveyed the materially false implication that Miller and Argo had misused or diverted Burlingame's investment funds.

168. That this claim was also false.

169. That the language used in the web page is different from the language used in either the original or amended complaint.

170. Krupnick, Burlingame and the Krupnick firm were aware that Burlingame authorized the use of funds as part of the $150,000.00 investment in Argo Marketing.

171. Burlingame's investment was made in September of 2022.

172. Krupnick and the Krupnick firm were on constructive notice of the affirmative investment by Burlingame in Argo Marketing no later than May 23, 2025.

173. Krupnick and the Krupnick Firm received the pre-suit accounting response through counsel before publication of the web page; the repository contains the transmission chain.

174. That the allegations posted by Krupnick and the Krupnick Firm were intentional, willful, wanton and made with reckless disregard for the truth.

175. On information and belief, Dan Miller, Argo, and Aurora Hill were used as keywords to drive traffic to the web page owned and operated by Krupnick and the Krupnick Firm.

176. The publication was available to the public and solicited prospective legal clients who claimed investment losses.

177. Statements regarding misappropriation of funds, misuse of funds, and diversion of investment capital are defamatory per se.

178. Plaintiffs suffered injury to reputation, mitigation expense and impairment of business opportunities as a direct and proximate result of the actionable publication.

179. The accusations of misappropriation of funds, as a criminal act, were inherently damaging.

180. Miller suffered personal and professional embarrassment and reputational injury and personally paid more than approximately $10,000 to Reputation Defender for mitigation

benefiting himself and Argo. He also devoted hundreds of hours and personal resources to accurate public-information websites concerning Aurora Hill, Argo and his prior business.

181. During 2026, Miller created the Aurora Hill due-diligence site and Argo Futures historical archive and substantially rebuilt Argo's former placeholder site. These efforts were intended to give prospects reliable information and address the continuing reputational effects.

182. Plaintiffs sought to mitigate the online harm through a May 15, 2026 motion and supporting memorandum asking the Southern District to seal its docket. The Court denied that request on May 19, 2026. The motion documented the claimed harm and an effort to reduce it; its denial did not resolve the truth of the investment accusations.

183. The effects remain ongoing, including repeated diligence inquiries, lost business opportunities, diversion of working time and reasonable mitigation expense. Each Plaintiff seeks only its own recoverable loss, and the requested recovery will exclude duplication among parties, causes of action and overlapping damage categories.

184. That each time a new person accesses the website and the Investment Partnership page, publication of this defamatory material is made to a new person.

185. That the publication by Krupnick and the Krupnick Firm were not part of any judicial proceeding.

186. That the publication by Krupnick and the Krupnick firm had no reasonable relation to the litigation.

187. That the knowing inclusion of provably false information and the fact that the website page in question contains a solicitation of business in the paragraphs following the false and defamatory publications, to wit:

Kevin P. Krupnick, Esq. is the founder of The Krupnick Firm. Mr. Krupnick has represented individual investors, institutional investors, family offices, and others in claims involving securities fraud, private placement misconduct, investment adviser violations, and brokerage firm supervisory failures. He also represents financial professionals, hedge fund managers, traders, and other industry participants in complex business and regulatory disputes.

Mr. Krupnick and his team have extensive experience representing clients in a wide range of civil litigation matters, including securities disputes, business litigation, corporate dissolution proceedings commonly referred to as "corporate divorce," employment matters, and general business litigation. In addition to representing investors in securities matters, the firm also represents businesses and individuals in disputes involving merchant cash advance transactions and commercial financing arrangements, including the defense of merchants and guarantors in litigation involving MCA funders.

If you invested in the Aurora Hill fund or other investment programs associated with Daniel Miller or Argo Private Client Group and experienced losses that you believe may be related to misrepresentations or other wrongdoing, contact The Krupnick Firm for a FREE case consultation.

188. That the statements were not made to a new outlet and were not part of any reporting on the lawsuit.

189. That the publication was a solicitation of business intended to improve the reputation of Krupnick and the Krupnick firm.

190. The the publication was consistent with the threats previously made by Krupnick to destroy Mr. Miller's business and his professional reputation.

191. No privilege applied to the publication of the false and defamatory statements.

192. As a direct and proximate result of the alleged unlawful conduct, Daniel Miller, Argo Private Client Group, Inc., have been damaged by Defendants Krupnick and the Krupnick Firm in an amount to be proven at trial, said compensatory damages being in excess of $75,000.00 for Argo and $75,000.00 for Daniel Miller and in excess of $225,000.00 apiece for Argo and Dan Miller.

**COUNT TWO**

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

193. Plaintiffs incorporate the allegations in paragraphs 1-192 as fully rewritten herein.

194. Leading Response supplied mailing-list selection, printing and mailing, venue coordination and reservation handling for Argo's educational seminars. Argo supplied the substantive materials and presentations. The parties used separate written orders for individual campaigns over a course of repeated engagements.

195. Leading Response did not introduce Burlingame to Aurora Hill, make an investment representation to him, manage his investment funds or participate in his investment transaction.

196. The Southern District dismissed the claims against Leading Response and denied leave to amend them on December 17, 2025. Plaintiffs had previously explained the vendor's lack of involvement in the investment.

197. That based on the documents available, including but not limited to the Agro Marketing Group agreement, Burlingame and Krupnick knew or should have known that Leading Response had not dealings with Burlingame, was not a member of Argo Marketing Group

and had no involvement with Burlingame's investment with Aurora Hill or Argo Marketing Group.

198. That Burlingame and Krupnick were aware that Leading Response was responsible for conducting mailers for seminars conducted by Aurora Hill and or Miller.

199. That the purpose of naming Leading Response in the complaint was to damage Miller's and /or Argo PCG's ability to continue to conduct business.

200. That prior to filing suit, Krupnick had threatened to destroy Miller's reputation and business if he did not refund Burlingame's investment.

201. Leading Response ceased doing business with Argo after being named in the litigation. Greg Ryan, the management contact to whom Miller appealed, told Miller that Leading Response had been advised by counsel to terminate the relationship because of the lawsuit. The termination made remaining goodwill and campaign credits unusable and foreclosed the follow-up campaigns we had discussed.

202. The relationship did not resume. On October 6, 2025, Miller asked Ryan in writing to secure approval to restart the seminars.. Those efforts were unsuccessful.

203. The loss included an opportunity to recover value from a completed Cary, North Carolina mailing. The original March 2023 events had been canceled because of Miller's illness. Leading Response had completed the paid mailing, and Argo did not claim a full unused contract credit; Miller and the vendor had discussed contacting prior respondents to arrange a follow-up without purchasing a second mailing. The relationship's termination foreclosed that proposed follow-up.

204. A Naples campaign had separately been canceled because of hurricane conditions. A post-hurricane rescheduling effort failed when only approximately six households could be

reconfirmed, and Leading Response supplied 1,500 additional mailing pieces for another campaign. Plaintiffs do not attribute those original weather and rescheduling losses to Defendants; they identify the later loss of the ongoing marketing relationship and feasible recovery efforts.

205. Defendants knew of Argo's relationship with Leading Response because their pleadings identified the vendor and its relationship with the business. Plaintiffs allege that the later coercive demands and threatened business destruction were intended to exploit the disruption and prevent Plaintiffs from continuing their business unless repayment was made.

206. Argo also lost a developed prospective relationship with Daniel Gonzalo, an investment professional with prior UBS and Santander experience, after discussions with Miller and Mackenzie J. Kastl in May 2026.

207. In the parties' discussions, Gonzalo described established client relationships through which he reasonably expected access to approximately $50 million to $100 million in assets. The contemplated offshore feeder arrangement had a commencement threshold of approximately $50 million, Argo's annual 2% management fee and 20% performance fee, and an initial twenty-four-month commitment during which the initial allocation would remain invested. The discussions had advanced to preparation of a memorandum of understanding when he withdrew. No MOU was completed and no assets were committed or funded.

208. On May 8, 2026, Gonzalo responded positively to the information Miller supplied. On May 11, he wrote that he had found "negative news regarding Aurora and Dan" and decided to

step away. Gonzalo identified the Southern District complaint as the material that caused concern. Miller offered clarification in a May 12 follow-up, but Gonzalo did not reengage.

209. Krupnick repeatedly threatened to destroy Miller's business and reputation, including the ability to attract future investment relationships.

210. Krupnick stated in writing that repeated filings would increase the visibility of the accusations. Plaintiffs allege that the demands and publication were intended to deter the investors and business relationships on which Argo depended.

211. In August 2026, Argo also discussed a regional-branch opportunity with Brian Ford and an institutional feeder arrangement with Charlie Jacobson. Ford's conversation did not progress after disclosure and questions about the material. Jacobson, an experienced derivatives professional with institutional relationships, declined after expressing concern about how his relationships would view the SDNY misappropriation allegations, despite an offered independent feeder structure.

212. Miller has repeatedly been told by prospective investors, institutional allocators and branch candidates that they found the allegations through online searches and wanted an explanation. The issue now recurs so frequently that Miller addresses it at the outset of diligence discussions to avoid an impression of concealment.

213. The allegations of misappropriation and a Ponzi scheme caused particular concern. Serious allocators told Miller that a procedural dismissal did not sufficiently resolve their diligence concerns, and the identified opportunities did not proceed.

214. Argo alleges that Defendants intentionally interfered with its business relationships without justification through the actionable coercive conduct described above, and that Krupnick's separate publication further impaired its reputation and ability to develop business. Argo

seeks recovery only to the extent the interference rests on unprivileged, independently actionable conduct and caused the claimed loss.

215. As a direct and proximate result, Argo lost business opportunities and incurred reasonable expense attempting to preserve or replace those relationships. It seeks proven net economic loss and other legally recoverable damages, accounting for the conditional nature of prospective allocations, expenses avoided and mitigation. No promised investment return or transfer of the full prospective asset base is alleged.

**COUNT THREE**

**INJURY CAUSED BY CRIMINAL CONDUCT**

**R.C. 2307.60**

216. Plaintiffs incorporate the allegations in paragraphs 1-215 as fully rewritten herein.

217. Krupnick, with purpose to obtain repayment of Burlingame's $1.6 million investment, threatened to expose or intensify accusations tending to damage Miller's personal and business reputation and to cause loss of future business. The alleged threats linked avoidance of those consequences to payment. For conduct on or after April 9, 2025, Plaintiffs allege extortion under R.C. 2905.11(B)(4) and (5); the corresponding provisions for earlier conduct were R.C. 2905.11(A)(4) and (5).

218. The threatened consequences included criminal prosecution and deliberate destruction of Plaintiffs' ability to attract clients and investment relationships. Plaintiffs allege that these threats were used to obtain a valuable benefit through the reputational pressure described above.

219. In response, Miller and Argo incurred expense obtaining legal advice and responding to the alleged threats, and undertook reasonable protective and mitigation efforts for their personal and business interests.

220. On information and belief, Burlingame authorized the threats and provided the information regarding his claimed relationship with / access to the owner of the private club who had authority to put legal / prosecutorial pressure on Miller through the Department of Justice.

221. Plaintiffs seek civil recovery under R.C. 2307.60(A)(1) for injury to person or property proximately caused by the alleged criminal acts. No criminal conviction is alleged or required as a prerequisite to asserting that statutory civil claim.

222. That the actions of Burlingame and Krupnick were willful, wanton and malicious.

223. That the actions of Burlingame and Krupnick were intentional.

224. That as a direct and proximate result of the actions of Burlingame and Krupnick, Plaintiff Miller was damaged in an amount to be proven at trial, said amount being in excess of $75,000.00 in actual damages and $225,000.00 in punitive damages.

## COUNT FOUR

## ABUSE OF PROCESS

225. Plaintiffs incorporate the allegations in paragraphs 1-224 as fully rewritten herein.

226. That, on information and belief, the filing of the lawsuit against Miller, Argo and Cross was in retaliation for Argo and Aurora Hill's previous action against Burlingame.

227. That on information and belief, the purpose of the lawsuit was to punish Miller by harming his businesses, his reputation and his personal relationships.

228. Even if Defendants had probable cause to bring some of the allegations contained in their complaint, those allegations were made with an alternative purpose.

229. The allegations against Miller and Argo were designed to damage Miller personally and professionally.

230. The allegations against Miller and Argo were designed to assist Krupnick in the promotions of his law firm.

231. The allegations were written in an intentionally provocative and legally unsupported or overblown manner to draw negative attention to Miller and his companies.

232. The allegations were written in an intentionally provocative, legally unsupported, or overblown fashion to support Krupnick's effort to market himself as a securities litigator.

233. The case was filed in the Southern District of New York without a proper legal basis.

234. The decision to file in the Southern District of New York was made to maximize negative exposure for Miller, Argo Private Client Group, Inc., and Aurora Hill, to increase Krupnick's exposure, and to increase the expense to Miller and the other affected parties.

235. The decision to assert a separately titled Ponzi Scheme claim, file in the Southern District of New York, and assert Investment Advisers Act claims was intentional, willful, wanton, and malicious.

236. The continuing prosecution of the allegations of fraudulent conveyance against Ms. Cross after Krupnick, and though him, Burlingame, were put on notice of the fact that Mr, Miller and Ms. Cross were divorced was to place additional pressure on Miller to settle and had nothing to do with Ms. Cross.

237. The continuing prosecution of the fraudulent conveyance allegations against Ms. Cross was for the purpose of further injuring Miller's personal relationships and public reputation.

238. That on information and belief, Burlingame was aware of the improper filing in the Southern District of New York, the overblown and imaginary causes of action and the decision to add Ms. Cross as a Defendant and authorized Krupnick to do same.

239. That no recovery would have ever been had from Ms. Cross.

240. As a direct result of Defendants' alleged willful, wanton, and malicious acts, Plaintiffs suffered damages to be proven at trial, said amount being in excess of $75,000.00 in actual damages and $225,000.00 in punitive damages.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against the Defendant or Defendants found liable, awarding:

A. Compensatory damages in an amount to be proved at trial for each Plaintiff's legally recoverable injuries, without duplicate recovery;

B. Punitive damages only upon the findings and within the limits of applicable law;

C. Attorney's fees and costs only to the extent independently authorized by statute, rule or applicable common law

D. Prejudgment and post judgment interest as permitted by law; and

E. Such other relief as the Court finds lawful and appropriate.

Respectfully Submitted,
/s/ Jay F Crook

Jay F Crook #0078499
Jay F Crook Attorney at Law, LLC
37903 Euclid Avenue
Willoughby, OH 44094
PH: 440-725-6203
EMAIL: jaycrooklaw@outlook.com

## JURY DEMAND

Plaintiffs demand a trial by jury of the maximum number on all issues so triable.

Respectfully Submitted,
/s/ Jay F Crook
Jay F Crook #0078499